UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE ESTATE OF KIM BOCHNIARZ,
  by Michael J. Bochniarz, Executor,

                                                REPORT
                          Plaintiff,                         and
             v.                               RECOMMENDATION

PRUDENTIAL INSURANCE COMPANY           11-CV-00867W(F)
  OF AMERICA,

                            Defendant.
_____

APPEARANCES:        E. PETER PFAFF, ESQ.
                          Attorney for Plaintiff
                          673 Main Street
                          Suite 5
                          East Aurora, New York  14052

                          d'ARCAMBAL LEVINE & OUSELY, LLP
                          Attorneys for Defendant
                          MICHELLE J. d'ARCAMBAL and
                          AIMEE P. LEVINE, of Counsel
                          40 Fulton Street
                          Suite 1005
                          New York, New York  10038

## <u>JURISDICTION</u>

This case was referred to the undersigned by Honorable Richard J. Arcara on

April 11, 2012, for all pretrial matters including preparation of a report and

recommendation on dispositive motions, and was transferred to Honorable Elizabeth A.

Wolford on January 30, 2015 (Doc. No. 61).  The matter is presently before the court on

motions filed February 25, 2014, by Plaintiff for partial summary judgment (Doc. No. 49),

and by Defendant for summary judgment (Doc. No. 51).

## BACKGROUND

Kim Bochniarz ("Bochniarz"), commenced this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), on October 17, 2011, asserting against Defendants Prudential Insurance Company of America ("Prudential"), and Sunbelt Beverage Company Long Term Disability Plan ("Sunbelt Disability Plan"), claims for long term disability benefits and for declaratory relief concerning group life insurance coverage.  In an Amended Complaint filed November 30, 2011 (Doc. No. 4), Bochniarz asserted the same claims against Prudential and her former employer, Sunbelt Beverage Company LLC ("Sunbelt"), and the action was discontinued as against Sunbelt Disability Plan.  On March 3, 2012, Bochniarz passed away.  One Carl J. Holmik ("Holmik"), was appointed executor of Bochniarz's estate. On September 13, 2012, Holmik, as executor of Bochniarz's estate, filed a Second Amended Complaint (Doc. No. 24) ("Second Amended Complaint"), asserting against only Prudential the disability benefits claim ("First Claim"), seeking declaratory relief that Bochniarz had been entitled to a premium waiver for group life insurance coverage ("Second Claim"), and discontinuing the action as against Sunbelt.  Prudential's answer to the Second Amended Complaint was filed on September 27, 2012.  On July 12, 2013, after the Surrogate Court of Niagara County had suspended Holmik's executory powers with regard to Bochniarz's estate, Plaintiff moved (Doc. No. 36), to substitute Michael J. Bochniarz as Executor of Bochniarz's estate, as Plaintiff, and the motion was granted by the undersigned by Text Order entered July 22, 2013 (Doc. No. 37).

On February 25, 2014, Plaintiff filed a motion for partial summary judgment (Doc. No. 49) ("Plaintiff's Motion"), supported by the attached Plaintiff's Statement of Uncontested Material Facts (Doc. No. 49-1) ("Plaintiff's Statement of Facts"), and the separately filed Memorandum of Law in Support of Rule 56 Motion Seeking Summary Judgment on the Standard of Review (Doc. No. 50) ("Plaintiff's Memorandum").  Also filed on February 25, 2014, was Defendant's motion for summary judgment (Doc. No. 51), Defendant Prudential Insurance Company of America's Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 52) ("Defendant's Memorandum"), the Declaration of Angela Holland (Doc. No. 53) ("Holland Declaration"), attaching exhibits A through C (Docs. Nos. 53-1 through 53-5) ("Holland Declaration Exh(s). __"), the Declaration of Renee Robinson (Doc. No. 54), attaching exhibits A through C (Docs. Nos. 54-1 through 54-3), and the Local Civil Rule 56.1 Statement of Material Facts (Doc. No. 55) ("Defendant's Statement of Facts").

Filed on April 14, 2014, were Defendant Prudential Insurance Company of America's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 57) ("Defendant's Response"), and Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 58) ("Plaintiff's Response"), attaching Plaintiff's Response to Defendant's L.R. 56.1 Statements (Doc. No. 58-1) ("Plaintiff's Responding Statement of Facts").  Filed on May 5, 2014, were Plaintiff's Memorandum in Reply to Defendant's Memorandum Opposing Plaintiff's Motion for Summary Judgment (Doc. No. 59) ("Plaintiff's Reply"), and Defendant Prudential Insurance Company of America's Reply Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 60) ("Defendant's Reply").

On June 9, 2015, Defendant, at the request of the court, filed as a continuation of exhibits the third page of the letter from Defendant advising Bochniarz of the termination of the long term disability benefits (Doc. No. 62).  Oral argument was deemed unnecessary.

 Based on the following, Plaintiff's motion (Doc. No. 49), should be GRANTED; Defendant's motion (Doc. No. 51), should be DENIED in part and GRANTED in part.

### FACTS[1]

Bochniarz commenced employment with Empire Merchants North, a division of Sunbelt Beverage Company, LLC ("Sunbelt"), as a computer programmer in February 2004.  As a Sunbelt employee, Bochniarz participated in the Sunbelt Beverage Company, LLC Long Term Disability Coverage Plan ("the LTD Plan" or "the Plan"), Robinson Declaration Exh. A at PRU 0001-41,[2] under Group Policy No. G-94655, and the Sunbelt Beverage Company LLC Employees of Empire Merchants North Employee Term Life Coverage Basic and Optional Plans "(the Life Insurance Plan").[3]  The LTD Plan is an employee welfare benefits plan governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et al.* ("ERISA").  The LTD Plan provides for a monthly long term disability benefit of 60% of the employee's monthly earnings, not to exceed $ 12,000 per month, and specifies that the long term disability benefit "may be reduced by deductible sources of income and disability earnings."  LTD Plan at PRU 0005.

---

[1] Taken from the pleadings and motion papers filed in this action.
[2] References to "PRU" are to the Bates No. of Plaintiff's Administrative Claim Record, portions of which are filed as exhibits to either the Robinson Declaration or the Holland Declaration.
[3] Robinson Declaration Exh. C.

The LTD Plan's contract ("Plan Contract"),[4] provides that

The entire Group Contract consists of: (1) the Group Insurance Certificate(s) listed in the Schedule of Plans, . . .; (2) all modifications and endorsements to such Group Insurance Certificates . . .; (3) the forms shown in the Table of Contents as of the Contract Date; (4) the Contract Holder's application . . . ; (5) any endorsements or amendments to the Group Contract; and (6) the individual applications, if any, of the persons insured.

LTD Plan Contract at PRU 0062.

Neither the LTD Plan nor the Plan Contract describes the manner in which disability is determined; rather, disability is defined in the LTD Plan's Certificate of Coverage ("Coverage Certificate"),[5] and provides that an employee will be considered disabled for purposes of receiving LTD benefits when Prudential determines that "you are unable to perform the *material and substantial duties* of *your regular occupation* due to your *sickness* or *injury*," are under a doctor's care, and have a greater than 20% loss of monthly earnings due to the sickness or injury.  Coverage Certificate at PRU 0014 (italics in original).  After a disabled employee receives LTD benefits for 24 months, the employee is considered disabled based on the same sickness or injury if the employee is "unable to perform the duties on any *gainful occupation* for which you are reasonably fitted by education, training or experience," and are under a doctor's care.  *Id.* (italics in original).  "Regular occupation" is defined as "the occupation you are routinely performing when your disability begins.  Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location."  *Id.* at PRU 0014.  "Gainful occupation" is defined as "an occupation, including self employment, that is or can be expected to provide you with an income within 12 months of your return to work . . . ."  *Id.* at PRU 0016.

---

[4] Robinson Exh. B at PRU 0056-67.
[5] Robinson Exh. A at PRU 0008-41.

Following the Coverage Certificate is a Summary Plan Description ("SPD")[6]

published by Sunbelt in accordance with ERISA requirements, specifying that Sunbelt is

both the Plan Sponsor and the Plan Administrator, SPD at PRU 0043, and Prudential is

the Plan's Claims Administrator.  *Id.* at PRU 0044.  The first page of the SPD states,

> The Summary Plan Description is not part of the Group Insurance Certificate.  It
> has been provided by your employer and included in your Booklet-Certificate
> upon the Employer's request.

SPD at PRU 0042.

The Life Insurance Plan ("Life Insurance Plan"),[7] contains an "Extended Death

Benefit and Waiver of Premiums During Total Disability" provision, according to which

the Life Insurance Plan's death benefit protection is extended while an employee is

totally disabled under the LTD Plan.  Life Insurance Plan at PRU 0900.  During an

employee's period of long term disability, premiums for the Life Insurance Plan are

waived ("Premium Waiver benefit").  *Id.*

On May 30, 2007, Bochniarz underwent an MRI of her thoracic spine, the results

of which indicated probable scoliosis and several cervical disk herniations for which MRI

of Bochniarz's cervical spine was recommended.  Administrative Record at PRU 0658.[8]

On June 27, 2007, Bochniarz became unable to work based on pain and fatigue related

to Systemic Lupus Erythematosus ("SLE" or "lupus"),[9] low back pain, shoulder, and arm

---

[6] Robinson Declaration Exh. A at PRU 0042-47.
[7] Robinson Declaration Exh. A at PRU 0886-0933.
[8] A copy of the Administrative Record for Bochniarz's LTD benefits and Premium Waiver claims is filed in two parts as Holland Declaration as Exhibits A (PRU 0068 – 0842) and B (PRU-000934-39).
[9] "Lupus is an autoimmune disease that can affect various parts of the body, including the skin, joints, heart, lungs, blood, kidneys, and brain.  Normally, the body's immune system makes proteins called antibodies to protect the body against viruses, bacteria, and other foreign materials.  These foreign materials are called antigens.  In an autoimmune disorder like lupus, the immune system cannot tell the difference between foreign substances and its own cells and tissues.  These antibodies – called 'auto-antibodies' (auto means 'self') – cause inflammation, pain, and damage in various parts of the body." National Institute of Allergy and Infectious Diseases: Understanding Lupus, available at:

pain.  LTD Benefits Application[10] at PRU 0664.

On July 6, 2007, Bochniarz's treating rheumatologist Joseph Grisanti, M.D. ("Dr. Grisanti"), examined Bochniarz in connection with an SLE flare accompanied by pain in her hands, feet, and nausea most of the time.  Administrative Record at PRU 0816. Bochniarz's CPK,[11] a muscle breakdown indicator, was 275 compared to a normal CPK level of less than 165, and Bochniarz had myopathy[12] and myalgias which were treated with Predinisone,[13] a steroid.  *Id.*  On August 6, 2007, orthopedic surgeon Edward D. Simmons, M.D. ("Dr. Simmons"), found Bochniarz with ongoing problems in her mid-lumbar region radiating into the left lateral hip/flank area and around the left groin, anterolateral thigh.  *Id.*  Bochniarz reported her symptoms had become "quite severe" she was unable to "cope at all," had to stop work, and had ongoing feelings of lower left extremity weakness with numbness and tingling.  *Id.*

In support of her LTD benefits claim, Bochniarz submitted a letter from her primary care physician David Thomas, M.D. ("Dr. Thomas"), dated August 6, 2007, stating Bochniarz reported "ongoing problems with her mid-lumbar region radiating into the left lateral hip and flank area as well as right around into the left groin and anterolateral thigh."  Administrative Record at PRU 0655.  According to Dr. Thomas,

---

http://www.niaid.nih.gov/topics/lupus/understanding/Pages/understanding/aspx (last visited June 23, 2015).

[10] Although Bochniarz's LTD Benefits Application is filed numerous times in the record, in the interest of simplicity, the court references only that copy filed as Administrative Record at PRU 0659-75.

[11] "Creatine phosphokinase (CPK) is an enzyme found mainly in the heart, brain, and skeletal muscle." Creatine phosphokinase test, available at http://www.nlm.nih.gov/mdelineplus/ency/article/003503.htm (last visited June 23, 2015).  An elevated CPK level indicates stress or injury to muscle tissue, the heart, or the brain.  *Id.*

[12] "The myopathies are neuromuscular disorders in which the primary symptom is muscle weakness due to dysfunction of muscle fiber.  Other symptoms of myopathy can include muscle cramps, stiffness, and spasm."  National Institute of Neurological Disorders and Stroke, NINDS Myopathy Information Page, available at: http://www.ninds.nih.gov/disorders/myopathy/myopathy.htm (last visited June 23, 2015).

[13] Prednisone is a steroid used to treat lupus symptoms of swelling and redness, but it cannot cure lupus. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited June 23, 2015).

Bochniarz reported her "quality of life is markedly affected" and she had to discontinue working.  *Id.*  Bochniarz's diagnoses included anxiety, depression, lupus and thyroid disease, with history of L2-L3 lumbar spine fusion fifteen years earlier.  *Id.*  at PRU 0655-56.  Dr. Thomas's review of Bochniarz's "radiographs reveal substantial collapse at  L3-4 and L4-5 with a solid fusion at L2-3" and correlated with "disc herniations at L3-4 and L4-5 . . . with loss of disc height and signal intensity."  *Id.* at PRU 0656.  Dr. Thomas discussed laminotomy and discectomy procedures at L3-4 and L4-5 with stabilization and fusion, which Bochniarz indicated she would consider undergoing.  *Id.*

On August 29, 2007, Dr. Grisanti noted that "high dose of Prednisone helped, decreased swelling, muscle problems, vertigo."  Administrative Record at PRU 0816.  Bochniarz still had "a great deal of pain," and had SLE with myositis (inflammation of the muscles used to move the body).  *Id.*

On September 20, 2007, Bochniarz applied for LTD benefits under the LTD Plan, asserting she was disabled by ongoing lupus exacerbation which was preventing Bochniarz from undergoing back surgery, decreased range of motion, depression, and difficulty sitting and standing for long periods of time.  *Id.* at PRU 0659.  Commencing with Bochniarz's application for LTD benefits and continuing throughout the period during which Bochniarz received LTD benefits, Defendant continually requested updated medical records, which were then reviewed to determine Bochniarz eligibility for LTD benefits ("Review Records").

In an Attending Physician Statement ("APS") dated October 1, 2007, Bochniarz's treating rheumatologist, Joseph Grisanti, M.D. ("Dr. Grisanti"), reported Bochniarz underwent lumbar fusion in January 1994, was suffering from lupus exacerbation which

was preventing further recommended back surgery, loss of range of motion, depression, and difficulty with prolonged sitting or standing, and her prognosis was "guarded." Administrative Record at PRU 0670- 77, PRU 0816. On October 1, 2007, Dr. Thomas noted Bochniarz's ongoing lupus exacerbation prevented Bochniarz from undergoing back surgery, and it was not known if Bochniarz would ever return to work. *Id.* at PRU 0816. On October 24, 2007, physiatrist Michael C. Geraci, Jr., M.D. ("Dr. Geraci"), gave Bochniarz an epidural steroid injection ("ESI") to her left L4 vertebra. According to a November 13, 2007 Review Records entry, Bochniarz's LTD benefits application was considered as "likely approvable due to lupus & need for L4-5 fusion." Administrative Record at PRU 0821.

On December 10, 2007, Dr. Thomas examined Bochniarz regarding Bochniarz's chronic lupus, anxiety, panic attacks, hypothyroidism, and chronic back pain. Administrative Record at PRU 0621. Dr. Thomas noted Bochniarz was on multiple medications including Lortab twice a day for pain, and Kloponin for anxiety, received an epidural injection in mid-November 2007, but continued to have back pain. *Id.* Dr. Grisanti was following abnormalities detected in blood tests, including persistently elevated CPK which was postponing Bochniarz's back surgery.[14] *Id.* Bochniarz also complained of right shoulder tightness with tenderness, and back pain. *Id.* Upon examination, Bochniarz moved "fairly slowly getting on and off the table," appearing uncomfortable, right shoulder had "fairly full range of motion with slightly decreased internal rotation of the joint," "some tenderness of the levator scapulae on the right-hand

---

[14] Bochniarz's CPK value was noted by Dr. Grisanti on July 6, 2007 as 275. Administrative Record at PRU 0816.

side and the latissimus dorsi muscles."[15]  *Id.*  Dr. Thomas assessed Bochniarz with lupus and possible fibromyalgia, hypothyroidism, anxiety/depression, and nicotine addiction.  *Id.*

On December 12, 2007, Prudential's internal registered nurse Collette Howe ("Nurse Howe"), conducted an Internal Capacity/Clinical Review of Bochniarz's LTD benefits application and medical records, including the October 1, 2007 APS, and records maintained by Drs. Grisanti, Geraci, Simmons and Thomas, to determine Bochniarz's functional capacity.  Administrative Record at PRU 0815-18.  Nurse Howe's analysis of Bochniarz's medical records noted Bochniarz's complaints were clinically correlated with physical examination findings, as well as lab results for lupus exacerbation, pending LB fusion, and that Bochniarz's expected recovery time following LB fusion would be three months for one level of spine fusion, and an additional one to two months for each additional level of fusion before Bochniarz could be expected to return to sedentary work.  *Id.* at 0816-17.  Nurse Howe noted that what treatment was planned for Bochniarz's neck-thoracic findings was "not clear," that Bochniarz appeared to have "a good response to steroids for her lupus," but that Bochniarz had "less than part time sedentary capacity at this time" through any recovery period for the recommended lumbar fusion.  *Id.* at PRU 0817.  Follow-up with Bochniarz for status of proposed surgery date in six months was suggested.  *Id.*  Bochniarz's LTD benefits application was then approved through April 2008, by George Wood ("Wood"),[16] who

---

[15] The medical definition of latissimus dorsi is "a broad flat superficial muscle of the lower part of the back that originates mostly in a broad aponeurosis attached to the spinous processes of the vertebrae of the lower back, the supraspinal ligaments, and the crest of the ilium, that is inserted into the bicipital groove of the humerus, and that extends, adducts, and rotates the arm medially and draws the shoulder downward and backward."  Medical Definition of Latissimus Dorsi, available at http://www.merriam-webster.com/dictionary/loatissiums%20dorsi (last visited June 23, 2015).
[16] Wood's position with Prudential is not identified in the record.

noted Bochniarz had been out of work since June 27, 2007 for lupus and back pain, that

Bochniarz's lumbar fusion surgery that had been scheduled for October 2007, was

postponed pending a lupus flare-up, but might be possible in January 2008, if

Bochniarz's lupus stabilized, that Bochniarz reported fatigue, rash, muscle weakness,

could stand for only a few minutes and used a cane to ambulate.  *Id.*  Bochniarz's next

office visit with her rheumatologist was scheduled for January 2008.  *Id.*  Clinical MRI

also revealed C6-7 herniations, need for surgery, and lupus flair.  *Id.*  Wood further

noted that Bochniarz would not have the capacity to perform her regular occupation until

three to four months after she had cervical fusion.  *Id.* at PRU 0817-18.

By letter dated December 12, 2007 ("Determination Letter"),[17] Prudential advised

Bochniarz of Prudential's determination that Bochniarz was disabled from her regular

occupation and approved to receive LTD benefits effective September 2, 2007.  The

Determination Letter further advised Bochniarz that her approval of LTD benefits was

subject to Bochniarz's continuing disability under the terms of the LTD Plan, and that

Bochniarz's monthly LTD benefits would be reduced by any monthly Social Security

Disability Benefits ("SSD benefits"), Bochniarz may be awarded.  Bochniarz returned to

Prudential an executed Reimbursement Agreement dated December 23, 2007, thereby

acknowledging her understanding that her LTD benefits may be reduced by any SSD

benefits she may receive.  The Determination Letter does not state the disabling

condition on which Defendant relied in determining Bochniarz was disabled under the

terms of the LTD Plan.  By letter to Bochniarz dated March 31, 2008 ("March 31, 2008

Letter"),[18] Prudential advised Bochniarz that so long as Bochniarz remained disabled

---

[17] Administrative Record at PRU 0742-44.
[18] Administrative Record at PRU 0068-69.

under the Plan, she was entitled to a premium waiver for the Life Insurance Plan, that her life insurance coverage would continue, and that Prudential's LTD department would continue to follow Bochniarz regarding her progress and work capability.  The March 31, 2008 Letter also does not indicate Bochniarz's disabling medical condition.

On April 4, 2008, Bochniarz was contacted by Allsup, an independent Social Security Disability Representation Medicare Plan Selection Service, confirming that Allsup had sent Bochniarz an "introductory package" for Bochniarz to complete and return to Allsup authorizing Allsup to file for SSD benefits on Bochniarz's behalf. Administrative Record at PRU 0831.  After receiving from Bochniarz the completed introductory package on April 15, 2008, and the signed overpayment agreement on June 9, 2008, and having interviewed Bochniarz on May 19, 2008, Allsup filed an SSD benefits application on Bochniarz's behalf.  On July 18, 2008, Allsup advised Bochniarz the Social Security Administration ("SSA") had issued a favorable determination on Bochniarz's SSD benefits application and that Allsup would proceed to recover any outstanding overpayment of LTD benefits once Bochniarz's award information was known.  On September 26, 2008, Bochniarz was awarded SSD benefits of $ 1,764.00 per month, effective December 2007, to be increased effective January 2008 to $ 1,770, and which would be offset against Bochniarz's LTD benefits.  Allsup eventually recovered as overpayment $ 12,406.

By letter dated February 18, 2009 ("February 18, 2009 Letter"),[19] Prudential informed Bochniarz that after 24 months of receiving LTD benefits, the definition of "disability" would change from an inability to perform "your regular occupation" to an

---

[19] Administrative Record at PRU 0738-39.

inability to perform "any *gainful occupation* for which you are reasonably fitted by
education, training or experience."  February 18, 2009 Letter at 1 (italics in original).
Bochniarz was further informed that the time limit for LTD benefits awarded based on
self-reporting symptoms, *i.e.*, 24 months, would end on September 24, 2009.

Prudential continued to request Bochniarz's updated medical records to monitor
whether Bochniarz, based on her medical condition, remained qualified for LTD
benefits.  On November 19, 2008, R.N. Sandra Burtchell ("Nurse Burtchell"), performed
on Prudential's behalf a Capacity/Clinical Review based on Bochniarz's recently
submitted updated medical records.  Administrative Record at PRU 0799-0801.  Nurse
Burtchell noted Dr. Grisanti was not then recommending lumbar fusion surgery because
of lupus flares with inflammation.  *Id.* at PRU 0799.  Dr. Grisanti reported Bochniarz was
requesting an injection for her shoulder pain, complained "of pain all over, muscle was
very sore," and recent lab work showed ANA[20] elevated at 1:160, speckled pattern, and
a positive Sjogren's AB, but renal panel was normal.  *Id.* at PRU 0800.  On June 3,
2008, physical therapist Paula Zablonski ("PT Zablonski"), saw Bochniarz for complaints
of constant bilateral low back pain, right shoulder and right hip pain, fluctuating between
3 and 8 on a scale of 10.  *Id.*  Bochniarz's Oswestry Disability Score[21] was 56%.  *Id.*
Palpation revealed tenderness over the right trochanteric bursa with limited right hip
abductor strength at 3-/5 and 4+/5 on left.  *Id.*  Tightness was appreciated in bilateral

---

[20] "ANA" stands for "antinuclear antibody."  ANAs are found in patients whose immune symptoms are
predisposed to cause inflammation against their own body tissue.  Definition of ANA, available at
http://www.medterms.com/script/main/art.asp?articlekey=2232 (last visited June 23, 2015).  An ANA test
is ordered to help screen for autoimmune disorders and is most often used as one of the tests to
diagnose lupus disorders.  *See* http://www.labtestsonline.org/understanding/analytes/ana/test.html (last
visited June 23, 2015).
[21] "The Oswestry Disability Index ("ODI") is the most commonly used outcome measure for low back
pain."  Owestry Disability Index Scoring Made Easy, available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647244/ (last visited June 23, 2015).  An ODI score of 56
indicates "severe disability."  *Id.*

posterior shoulder capsules with inconsistent impingement testing noted. *Id.* Lumbar and pelvic range of motion was decreased. *Id.* PT Zablonski recommended Bochniarz attend physical therapy two to three times per week, with Bochniarz's goal to increase her range of motion by 5-10 degrees, reduce her disability score to 45% and improve pain by 25%. *Id.* On July 1, 2008, PT Zablonski discharged Bochniarz from further physical therapy, reporting that because of finances and travel distance, Bochniarz had attended only one physical therapy session per week, was unable to adequately modify her prescribed home program to allow pain-free exercise, the location of Bochniarz's pain continually changed, and she was experiencing another flare in pain. *Id.* at 801. Nurse Burtchell's analysis was that Bochniarz's SLE was stable and controlled with steroids, and despite Bochniarz's complaints of muscle pain involving different sites at different times, physical exams did not reveal joint swelling. *Id.* at 802. Nurse Burtchell summarized Bochniarz's medical records as supporting lack of sustained functional capacity beyond activities of daily living attributed to chronic lumbar pain, but with ongoing comprehensive pain management and possible future surgical intervention, improvement in symptoms and functional capacity was possible. *Id.* Burtchell attributed no current restrictions or limitations to Bochniarz's SLE and depression, and suggested updating Bochniarz's medical records in six months, with Bochniarz's LTD benefits and Premium Waiver benefit extended to that time. *Id.*

In a Prudential Group Disability Insurance Comprehensive Claimant Statement ("Claimant Statement"), completed by Bochniarz on May 18, 2009 ("May 18, 2009 Claimant Statement"),[22] Bochniarz identified her disabling condition as arm, leg, back and muscle pain, fatigue, weakness, muscle atrophy, Lupus, vasculitis, Raynaud's

---

[22] Administrative Record at PRU 0536-42.

syndrome,[23] Sjögrens syndrome,[24] myositis, bursitis, and degenerative disc disease. With regard to returning to work, Bochniarz stated that completing the form caused pain in her arm, she could not drive often because of leg and arm pain and the effects of pain medication, she could not remain in one position for any length of time, there were days when leg cramps confined Bochniarz to bed, she could not use her right arm for any length of time and walking was difficult. Bochniarz did not then feel she could perform any work, but hoped her illness would go into remission. Bochniarz described her activities of daily living as limited because it took her two hours each morning to "get myself [to] where pain is bearable," she could not perform many household chores other than dusting, folding clothes, simple cooking, she could shower but could not bathe in a tub, and her daughter performed most of the household chores including shopping, trimming Bochniarz's toenails, and brushing Bochniarz's dog. Bochniarz reported driving only to medical appointments but nowhere else because of pain and an inability to stay in one position. Bochniarz's medications then included, *inter alia*, Prednisone, Plaquenil,[25] azathioprine (anti-inflammatory), diclofenac sodium (anti-inflammatory), and

---

[23] "Raynaud's syndrome" or "Raynaud's phenomenon" "is a condition resulting in a particular series of discolorations of the fingers and/or the toes after exposure to changes in temperature (cold or hot) or emotional events. Skin discoloration occurs because an abnormal spasm of the blood vessels causes a diminished blood supply to the local tissues." Raynaud's Phenomenon, available at http://www.medicinenet.com/raynauds_phenomenon/page2.htm (last visited June 23, 2015). Initially, the involved digit turns white because of the diminished blood supply, then blue because of prolonged lack of oxygen, and, following reopening of the blood vessels, a local "flushing" phenomenon causes the involved digits to turn red. *Id.*

[24] Sjögren's syndrome "is a disease in which the immune system attacks the glands that make moisture for the body, such as tears and saliva. The damage keeps the glands from working the way they should and makes your eyes and mouth dry. The disease may also cause other problems, such as fatigue and pain in the joints." Sjögren's Syndrome – Topic Overview, available at http://www.webmd.com/arthritis/tc/sjogrens-syndrome-topic-overview (last visited June 23, 2015).

[25] Plaquenil or "hydroxychloroquine" is an antimalarial drug used to treat acute malaria attacks and to prevent inflammation caused by lupus in patients whose symptoms have not improved with other treatments. Hydroxychloroquine (Plaquenil), available at http://www.medicinenet.com/hydroxychloroquine/article.htm (last visited June 23, 2015).

hydrocodone (opioid analgesic for moderate to severe pain).  Administrative Record at

PRU 541.

Between March and May 2009, Bochniarz was treated by rehabilitative medicine

specialist Philip T. Kuruvilla, M.D. ("Dr. Kuruvilla").  Upon examining Bochniarz on

March 11, 2009, Bochniarz had "mild apprehension with range of motion of the right

shoulder," "focal tenderness over the right lateral epicondyle at the enthesis," "passive

range of motion of the hips showed discomfort and pain at end range in right hip internal

rotation which [was] slightly limited," "some tenderness in the thoracic paraspinal area

and over the posterior intercostal area diffusely," and lateral rotation of the lumbar spine

"causes mild pain bilaterally, more so on the right side."  Administrative Record at PRU

0397.  Sensory examination showed "some patchy impairment of pinprick sensation in

the lower extremities, impaired right L3, S1, and L4 impaired on the left side.  Deep

tendon reflexes are absent over the knees and ankles and not well elicited over the

upper extremities too."  *Id.*  Dr. Kuruvilla's impression was "[g]eneralized

musculoskeletal and joint pain which is multifactorial and could be caused by lupus

erythematosus and the associated anthralgias and arthritis. . . ."  Administrative Record

at PRU 0398.  Dr. Kuruvilla also found Bochniarz to have degenerative disk disease and

disk herniation at the lumbar spine, no signs of myelopathy, but "she does have

myofascial pain syndrome[26] and myositis again from lupus."  *Id.*  Dr. Kuruvilla's

treatment plan included various physical therapies include aquatic and land-based,

"vigorous stretching especially of the latissimus, trapezius, as well as paraspinal

---

[26] "Myofascial pain syndrome ("MPS") is a chronic condition that affects the fascia (connective tissue that covers the muscles)."  Myofascial Pain Syndrome (Muscle Pain), available at http://www.webmd.com/pain-management/guide/myofascial-pain-syndrome (last visited June 23, 2015).  Myofascial pain ("MFP") symptoms "usually involve muscle pain with specific 'trigger' or 'tender' points. The pain can be made worse with activity or stress."  *Id.*

stretching and strengthening; lumbosacral stabilization; McKenzie trial; and aerobic exercises." *Id.* Dr. Kuruvilla stated, "I do not believe she is a surgical candidate and I doubt it will take away all her pain." *Id.* Upon reexamining Bochniarz on March 26, 2009, in follow up for electrodiagnostic studies of the lumbar spine and lower extremities, Dr. Kuruvilla found Bochniarz with lupus erythematosus and generalized musculoskeletal and joint pain. *Id.* at PRU 0391. Dr. Kuruvilla's findings summary of a disposable monopolar needle EMG included "[m]otor conduction study of left peroneal nerve showed low amplitude and relatively low conduction velocity while latency was normal," "right peroneal nerve shows slightly low velocity of conduction" "[t]ibial motor study on the left side showed normal latency but reduced amplitude, and the right tibial showed slightly prolonged latency and low amplitude," and "sensory studies of the sural nerves bilaterally showed mildly prolonged latencies and low amplitudes." *Id.* Dr. Kuruvilla's conclusion from the EMG study was "electrodiagnostic evidence of mild bilateral sensory motor peripheral neuropathy," which "could be secondary to [Bochniarz's] chronic lupus erythematosus which may be the cause of vasculitis and directly causing the generalized neuropathy." *Id.* at PRU 0392. Dr. Kuruville opined that Bochniarz "will not benefit from any lumbar epidural steroid injections. She will need control of her lupus and focus more on home exercise program." *Id.* On May 12, 2009, Dr. Kuruvilla again examined Bochniarz who was ambulating with a normal gait, had full range of motion in both her upper and lower extremities, symmetrical muscle strength, well maintained lumbar lordosis, normal balance, and was without significant neurological deficits. *Id.* at PRU 0390. Dr. Kuruvilla's impression was "[c]hronic pain syndrome with system lupus erythematosus," which Dr. Kuruvilla noted Bochniarz had

treated with "multiple conservative and rehab treatment modalities, but without any help." *Id.* Dr. Kuruvilla, at Bochniarz's request, ordered Bochniarz a lumbosacral brace which Bochniarz was to use for only short periods of time to prevent deconditioning of her paraspinal and abdominal musculature, and was also recommending Bochniarz see a pain management specialist. *Id.*

Prudential's May 29, 2009 clinical assessment of Bochniarz's LTD benefits claim by R.N. Carrie Eccles ("Nurse Eccles"), who was in receipt of Dr. Kuruvilla's treatment notes, noted Bochniarz was out of work due to SLE and back pain, a lupus flare had postponed L4-5 fusion, Bochniarz had no plan to return to work, claiming she had pain everywhere and was unable to do anything and her daughter performed most household chores and shopping. Administrative Record at PRU 0795. Nurse Eccles noted "[t]here appears to be significant underlying pain disorder and a possible BH component.[27] In this setting it is difficult to fully assess her r/ls due to the complexity and multiple conditions, however what can be discerned is that as of the 5-11-09 [office visit], she did not have any significant low back exam findings." *Id.* at PRU 0796. Nurse Eccles recommended obtaining additional medical records and possible physical surveillance because Bochniarz was difficult to reach by telephone. *Id.*

Upon examination on June 24, 2009, Dr. Thomas noted Bochniarz "appears older than stated age, chronically ill, appropriately developed for age, weak, well hydrated, well nourished, appropriately groomed, appropriately dressed, fatigued and uncomfortable." Administrative Record at PRU 0387.

On July 9, 2009, Bochniarz was examined by pain management specialist Pratibha Bansal, M.D. ("Dr. Bansal"), for complaints of pain in her lower back,

---

[27] The record neither defines "BH component" nor the significance of such a component.

shoulders, knees and "all over."  Administrative Record at PRU 0383, 0502.  Upon physically examining Bochniarz, Dr. Bansal's impression was "[e]xtensive amount of myofascial pain in the lumbar paravertebral, gluteal, pyriformis, iliotibial facia. Tenderness over the L-5 S-1 facet joints right and left.  Sensory, motor, deep tendon reflexes normal in the upper extremities.  Extensive amount of myofascial pain in the neck shoulder upper back."  *Id.* at PRU 0386, 0505.  Dr. Bansal discussed with Bochniarz the need to use a traction unit for her lower back and to follow a home-based lumbar spine exercise and stretching program for core strengthening, and that such program was to be done on a long-term basis for maintenance.  *Id.*

On August 10, 2009, Research Consultants Group, Inc. ("RCGI"), a professional investigations company, was retained by Defendant to open an investigation to ascertain Bochniarz's typical daily activity level and involvement with a potential dog breeding business known as "Mandy's Puppy Patch."  Administrative Record at PRU 0463-67.  The RCGI surveillance team ("the surveillance team"), confirmed Bochniarz lived with her adult, unmarried daughter in a single-story ranch style home situated on a large plot of land on a rural road with little vehicular traffic.  *Id.* at PRU 0466.  The surveillance team spoke with several neighbors who reported Bochniarz had resided at the home for five to ten years, with her unmarried adult daughter Amanda who was then between 20 and 25 years old.  *Id.*  Neighbors also "believed" Bochniarz was not gainfully employed but was "a fairly active individual" who "comes and goes from her residence at various times of the day and usually does so on multiple occasions."  *Id.* The surveillance team reported that "it is indicated to us that the subject is usually running errands in town or going shopping," *id.*, that Bochniarz would spend several

hours away from her home, *id.*, and was capable of driving. *Id.* Another neighbor reported Bochniarz was not working and kept a "random schedule," and confirmed that Bochniarz and her daughter operated a dog breeding business at the residence. *Id.* According to the neighbor, "[Bochniarz] and her daughter are known to raise small dogs and sell them for a profit," and "depending on the time of the year, there are several random individuals at [Bochniarz's] residence, as they appear to be purchasing dogs." *Id.* at PRU 0466-67. The surveillance team then contacted Bochniarz's daughter by telephone in an attempt to elicit information regarding whether Bochniarz was actively involved in breeding dogs for profit. *Id.* at PRU 0467. The surveillance team's first call to the phone number was forwarded to a voicemail system indicating that anyone interested in purchasing a dog should call back later. *Id.* The surveillance team's second call was answered by an individual who introduced herself as "Amanda" and confirmed she is Bochniarz's daughter, and that they are both involved in the breeding and raising of small dogs, with Amanda raising Cavaliers and Bochniarz raising Yorkshire Terriers. *Id.* Amanda further stated that she and her mother cared for the dogs in their home and that potential purchasers could visit but recommended they make an appointment as Bochniarz and Amanda "are very busy throughout a given day." *Id.*

On August 13, 2009, Bochniarz underwent a neuromuscular consultation performed by Tomas Holmlund, M.D. ("Dr. Holmlund"), who noted Bochniarz complained she "hurt everywhere even my head, chest. . . ." Administrative Record at PRU 0169. Dr. Holmlund reported Bochniarz's CPK was "mildly elevated to 244. ANA is positive to 1 to 640, complements are low, rheumatoid factor is negative." *Id.* Upon

examination, Bochniarz appeared "chronically ill and ash color. . . ." *Id.* at PRU 0170. Dr. Holmlund's impression was pain syndrome, opining, "I do not think [Bochniarz's] diffuse, more or less constant pain involving essentially her whole body is neurogenic or may be better put not emanating, mostly from the neuromuscular apparatus." *Id.* It was Dr. Holmlund's "sense" that exercise exacerbated Bochniarz's pain. *Id.*

In an August 18, 2009 Claim Management note, one Alicia Diaz ("Diaz"), requests surveillance of Bochniarz's residence for two or three days because an "[a]ctivity check has been returned noting that [Bochniarz] is quite active during the day including a dog breeding business along with her 23 y/o daughter. In addition, several ads around have [Bochniarz's] phone number as the business contact information." Administrative Record at PRU 0788-94. A three-day video surveillance of Bochniarz's residence, arranged by Prudential was performed by RCGI between August 25 and 27, 2009. According to the Video Surveillance Report,[28] Bochniarz was not observed outside her residence on August 25, 2009, although her daughter was observed leaving the residence at 9:28 A.M., returning at 2:17 P.M. Administrative Record at PRU 0455. On August 26, 2009, a vehicle registered to Bochniarz was observed leaving the residence, although Bochniarz was not identified as the vehicle's occupant. *Id.* at PRU 0453, PRU 0456. Despite pursuing the vehicle, traffic conditions caused the surveillance team to lose sight of the vehicle. The vehicle was away from Bochniarz's residence for at least three hours, at which time the surveillance was terminated for the day. *Id.* at PRU 0456. During the three-day observation period, Bochniarz was definitely observed only on August 27, 2009, when she exited her home and spoke with an unidentified male for several minutes before walking behind the home. *Id.* at PRU

---

[28] Administrative Record at PRU 0452-57.

0453-57.  A dog kennel was observed in the rear of Bochniarz's residence.  *Id.* at PRU

0454.  At the conclusion of the three-day surveillance period, RCGI stated that because

Bochniarz "was not that active during our three days of surveillance, we might

recommend conducting any additional surveillance around an upcoming event such as

a local dog show or medical appointment."  *Id.* at PRU 0454.

By letter dated September 10, 2009 ("Termination Letter"),[29] Prudential advised

Bochniarz that Prudential had determined Bochniarz no longer met the criteria for LTD

benefits under the LTD Plan because Bochniarz's medical records in her file did not

support the conclusion that Bochniarz was unable to perform her regular occupation as

a computer programmer which was classified as a sedentary position, and, thus,

Bochniarz's LTD benefits claim was terminated effective August 31, 2009, the date her

medical records were reviewed.  According to Prudential, Bochniarz was "able to

socialize regularly, perform daily activities, and maintain energy throughout the day."

Administrative Record at PRU 0734.  Prudential continued that

> Based on our clinical review of all the information available, we find that you are
> physically capable of performing constant sitting, occasional standing/walking,
> occasional lift/carry up to 10 lbs and occasional bending.  These restrictions are
> based on your diagnosis of Lumbar Degenerative Disc Disease and Cervical
> Herniated Nucleus Pulposis.  There are no restrictions or limitations secondary to
> the Lupus, Myofascial pain, or Anxiety/Depression.

Administrative Record at PRU 0734.

Bochniarz was further advised she had 180 days to appeal the decision.  By letter dated

September 14, 2009 ("Premium Waiver Termination Letter"),[30] Prudential further

advised that because Bochniarz was no longer considered disabled in accordance with

the LTD Plan, she also was no longer eligible for the Premium Waiver benefit under the

---

[29] Administrative Record at PRU 0732-35.
[30] Administrative Record at PRU 0071-74.

Life Insurance Plan, and her claim for such waiver was terminated effective August 28, 2009, although Bochniarz had 180 days to appeal the decision.

By letter dated March 5, 2010,[31] Bochniarz advised Prudential of her intention to appeal Prudential's decision to terminate her LTD and Premium Waiver benefits, but that she was awaiting receipt of additional medical records to support the appeal, and requested an extension of time to appeal until April 19, 2010.  By letter dated March 23, 2010, Prudential requested Bochniarz submit updated medical records from Drs. Grisanti, Geraci, Thomas, Simmons, and Kuruvilla, as well as Buffalo Rheumatology. On April 19, 2010, Bochniarz filed her appeal asserting Bochniarz remained unable to work because of lupus and resulting joint, leg and back pain, and fatigue ("First Appeal").  In connection with Bochniarz's First Appeal, on April 22, 2010, Prudential referred Bochniarz's file to three specialists for review, including psychiatrist Antoinette Acenas, M.D. ("Dr. Acenas"), rheumatologist Mark R. Burns, M.D. ("Dr. Burns"), and pain management specialist Ephraim K. Brenman, D.O. ("Dr. Brenman") ("the medical review specialists).  Based on Bochniarz's medical records and the independent evaluations by the three review medical specialists, Prudential, by letter dated May 7, 2010 ("First Appeal Determination"),[32] upheld the decision in the Termination Letter that Bochniarz's LTD benefits be discontinued because Bochniarz was no longer disabled as defined under the LTD Plan.  Prudential specifically stated that although Bochniarz had been diagnosed with lupus, "there is no documented involvement except for a possible flare in November 2009 when she had knee pain and GI complaints.  This was not a persistent problem.  Rheumatology notes and letters note serologic lupus, but this

---

[31] Administrative Record at PRU 0094.
[32] Administrative Record at PRU 00713-18.

is not an assessment of disease severity." Administrative Record at PRU 0716.

Prudential further asserted that Bochniarz's self-reported symptoms of diffuse pain,

which seemed to be her main complaint, were not supported by, consistent with, or

proportionate to diagnostic testing. *Id.* at PRU 0717. By letter dated May 21, 2010,

Prudential advised Bochniarz that the decision to terminate Bochniarz's Life Insurance

Plan Premium Waiver benefit was also being upheld ("Premium Waiver Appeal

Decision").[33] Prudential's decisions upholding their earlier determinations were based

on the medical records submitted by Bochniarz, Prudential's medical review specialists'

conclusions that Bochniarz's self-reported symptoms of pain were not supported by,

consistent with, or proportionate to the diagnostic testing and physical examinations,

such that Bochniarz's medical records did not support her claim that she was unable to

perform the duties of her computer programmer occupation. By letter dated November

2, 2010, Bochniarz submitted her second appeal ("Second Appeal"), of the denial of her

LTD benefits and Premium Waiver benefits, asserting Bochniarz was disabled by lupus,

chronic pain and fatigue, and orthopedic problems. Accompanying her Second Appeal

were additional medical records.

On December 1, 2010, Bochniarz underwent anterior cervical discectomy and

fusion ("ACDF") surgery for C4-C5, C5-C6, and C6-C7 three level fusion and four level

plating performed by Kevin Gibbons, M.D. ("Dr. Gibbons"). On December 28, 2010,

Prudential referred Bochniarz's case for additional surveillance by RCGI. Administrative

Record at PRU 0142-48. During the three days of observation, the surveillance team

never observed Bochniarz or any activity near the Bochniarz's residence other than a

vehicle not registered to Bochniarz arriving and departing on several occasions and one

---

[33] Administrative Record at PRU 0078-83.

incident in which Bochniarz's daughter is observed driving her own vehicle to the residence, parking and exiting the vehicle, and carrying a grocery bag into the resident. *Id.* at PRU 0145.  Because the surveillance team never observed Bochniarz during the three days of surveillance, a post surveillance inquiry was made in which the surveillance team performed a covert visit to Bochniarz's residence to obtain additional information regarding the dog breeding business.  *Id.* at PRU 0147.  When the surveillance team pulled into the driveway, barking dogs emerged from the kennel behind the house.  *Id.* at PRU 0148.  A note on the residence's front door stated "[a]n appointment is necessary to view the dogs.  Please do not arrive without an appointment."  *Id.*  The note did not provide a telephone number and the windows of Bochniarz's residence were covered with blinds and towels.  *Id.*  After the surveillance team members rang the doorbell, a male exited from the garage who confirmed Bochniarz had been in the hospital, and that Bochniarz and her daughter were still selling and breeding dogs, but that an appointment was needed to see the dogs and Bochniarz was in no condition to show the dogs at that time.  *Id.* at PRU 0143, 148. The male then provided the surveillance team with Bochniarz's daughter's telephone number.  *Id.* at PRU 0148.

On February 4, 2011, Prudential referred Bochniarz's case for a final external review by occupational medicine specialist Tanisha Taylor, M.D. ("Dr. Taylor"). Administrative Record at PRU 0127-38.  Dr. Taylor reviewed Bochniarz's medical records from August 13, 2009 through December 5, 2010, in which Bochniarz is repeatedly diagnosed by Drs. Grisanti and Thomas as having SLE and pain, *id.* at PRU 0127-38, as well as an August 10, 2009 investigation confirming that Bochniarz "was

actively involved in a dog-breeding business operated out of the house with her daughter, that it was confirmed that she was not presently working, but that she did keep a very busy lifestyle, often coming and going from her house several times a day, and remaining away from her home for several hours at a time." *Id.* at PRU 0131.  Dr. Taylor reported that Bochniarz, from September 1, 2009, had medically necessary restrictions and limitations, including sitting for up to one hour at a time for up to eight hours in an eight hour workday with the ability to reposition or stretch every 30 minutes, stand or walk for 30 minutes at a time up to six hours in an eight hour workday, occasionally lift, carry, push or pull up to 10 pounds bilaterally, but never lift, carry, push or pull more than 10 pounds, no overhead work, reaching above shoulder level, occasionally could reach below waist/desk level, frequently reach at waist level bilaterally, no climbing ladders, working at unprotected heights or balancing, no operating safety sensitive machinery, could occasionally kneel, squat, crouch, stoop, bend at the waist, and twist, frequently handle, finger, feel, grip, grasp, hold, pinch, and perform repetitive and fine motor activities.  *Id.* at PRU 0134.  Most of Bochniarz's restrictions and limitations were likely to be permanent post surgery, but should be revisited following maximum medical improvement.  *Id.* at PRU 0134-35.  Dr. Taylor found Bochniarz's "complaints of fatigue and cognitive dysfunction have not been well elucidated and there is a lack of documentation to [ ] support this outside of the claimant's subjective complaints.  Further, a review of the records does not support a current lupus flare." *Id.* at PRU 0136.  According to Dr. Taylor,

> The restrictions and limitations posed by Dr. Grisanti are not medically necessary and the records, especially the surveillance documentation, indicate that the claimant is capable of more.  On 08/10/2009, an investigation was conducted on the claimant which confirmed that she was actively involved in a dog-breeding

business being operated out of the house with her daughter, that it was
confirmed she was not presently working but that she did keep a very busy
lifestyle, often coming and going from her house several times a day, and
remaining away from her house for several hours at a time."

*Id.* at PRU 0137.

On February 28, 2011, after reviewing Bochniarz's updated medical records,

including Dr. Grisanti's questionnaire and Dr. Taylor's external review, Prudential

referred Bochniarz's claim to Gregg Schwartzkopf ("Schwartzkopf"), for a vocational

rehabilitation assessment to clarify how Bochniarz's regular computer programming

occupation would normally be performed.  Administrative Record at PRU 0754-56.  On

March 2, 2011, Schwartzkopf assessed the limitations Dr. Taylor identified, including

primarily sitting with occasional standing, lifting 10 pounds, reaching over the shoulder

and below the waist, no overhead lifting, frequent reaching, handling, fingering, gripping,

and related fine motor skills, with the ability to take short breaks throughout the day, as

consistent with Bochniarz's own sedentary occupation.  *Id.*  Schwartzkopf concluded

Bochniarz could perform a sedentary occupation such as her regular computer

programmer position, or could transfer her skills to a similar occupation provided

Bochniarz had kept her skills current with technological advances.  *Id.*

By letter dated March 15, 2011 ("Second Appeal Determination"),[34] Prudential

again upheld its decision to terminate Bochniarz's LTD and Premium Waiver benefits.

The cervical spine surgery Bochniarz underwent in December 2010, 14 months after

she was found to be no longer disabled, was irrelevant to Prudential's determination

that as of September 2009, Bochniarz was not disabled from performing her regular

sedentary occupation as a computer programmer.  Bochniarz was also advised that per

---

[34] Administrative Record at PRU 0685-93.

the LTD Plan's language, she was only eligible for benefits in connection with illnesses based on self-reported symptoms for 24 months from the time of her claim.  The Second Appeal Determination was Prudential's final decision on the matter, although Bochniarz could further challenge the decision by filing a lawsuit under ERISA. Accordingly, Bochniarz commenced the instant action on October 17, 2011.

According to a Certificate of Death ("Death Certificate") (Doc. No. 21), Bochniarz passed away on March 3, 2012, from congestive heart failure, as a consequence of chronic myocarditis (inflammation of the heart muscle), resulting from systemic lupus erythematosus.  The Death Certificate further indicates Bochniarz had suffered with congestive heart failure and chronic myocarditis for one year, and lupus for more than one year, and had been hospitalized from February 13, 2012, until her death on March 3, 2012.

## DISCUSSION

### 1.    Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Plaintiff seeks summary judgment only on the standard of review, arguing that because the LTD Plan documents do not clearly grant Prudential discretionary authority over claims, the default *de novo* review applies to her ERISA claims, Plaintiff's Memorandum at 10-14, requiring a trial on the merits of Plaintiff's claims.  *Id.* at 14-15. Prudential argues in support of summary judgment and in opposition to Plaintiff's Motion that its decision terminating Bochniarz's LTD benefits is subject to an arbitrary and capricious review, rather than *de novo* review, Defendant's Memorandum at 13-20, Defendant's Response at 10-19, but that under either review standard, Prudential's determination was based on evidence in the administrative record and should not be overturned.  Defendant's Memorandum at 20-25; Defendant's Response at 23-24. Prudential further maintains that Bochniarz's receipt of LTD benefits based on self-reported symptoms was subject to a limited period of time, *id.* at 25-27, that Prudential was not required to perform an independent medical examination of Bochniarz, *id.* at 27-29, and that Prudential's offset of Bochniarz's SSD benefits was not improper.  *Id.* at 29-30.  In further support of Plaintiff's Motion and in opposition to Defendant's Motion, Plaintiff reiterates that Plaintiff's claims are subject to *de novo* review, Plaintiff's Reply at 6-11; Plaintiff's Response at 2-4; and that the language in the SPD granting Prudential discretionary authority is insufficient because the SPD is not part of the LTD Plan. Plaintiff's Reply at 12-13; Plaintiff's Response at 4-6.  Plaintiff further argues in opposition to Defendant's Motion that the self-reported symptoms limitation does not support Prudential's termination of Bochniarz's LTD benefits because such limitation was never provided as a reason for terminating Bochniarz's benefits, Plaintiff's Response at 7-9, that such limitation does not apply to the instant facts, *id.* at 9-11, and

that Bochniarz's medical records submitted to Prudential in support of Bochniarz's LTD

benefits claim were sufficient to establish she continued to be disabled from working.

*Id.* at 12-13.  In further support of summary judgment, Prudential urges the court to

apply the arbitrary and capricious standard of review to Plaintiff's claims, Defendant's

Reply at 2-10, but that under either standard the claims should be dismissed in their

entirety, *id.* at 10, because Plaintiff's burden of demonstrating Bochniarz's continuing

disability as defined in the LTD Plan has not been met, *id.* at 11-14, and Plaintiff's

interpretation of the self-reporting symptoms limitations is incorrect.  *Id.* at 14-16.

## 2.      ERISA Standard of Review

The court first addresses the threshold issue of the correct standard of review to

be applied to Prudential's decision to terminate Bochniarz's LTD benefits under the LTD

Plan.[35]

Plaintiff seeks summary judgment only on the standard of review, arguing that

because the LTD Plan documents do not clearly grant Prudential discretionary authority

over claims, the default *de novo* review applies to Plaintiff's ERISA claims, Plaintiff's

Memorandum at 10-14, requiring a trial on the merits of such claims.  *Id.* at 14-15.

Prudential argues in support of summary judgment and in opposition to Plaintiff's Motion

that its decision terminating Plaintiff's LTD benefits is subject to an arbitrary and

capricious review, rather than *de novo* review.  Defendant's Memorandum at 13-20,

Defendant's Response at 10-19.  In further support of Plaintiff's Motion and in

opposition to Defendant's Motion, Plaintiff reiterates that the claims are subject to *de*

---

[35] Although not specifically stated in the record, the parties do not dispute that Prudential, as the LTD
Plan's Claims Administrator, made the ultimate decision to terminate Bochniarz's LTD benefits under the
LTD Plan.  As such, the court presumes, with regard to the instant summary judgment motions, that
Prudential was, in fact, the relevant decision maker.

*novo* review, Plaintiff's Reply at 6-11; Plaintiff's Response at 2-4; and that the language in the SPD granting Prudential discretionary authority is insufficient because the SPD is not part of the LTD Plan.  Plaintiff's Reply at 12-13; Plaintiff's Response at 4-6.  In further support of summary judgment, Prudential urges the court to review Plaintiff's claims under the arbitrary and capricious standard.  Defendant's Reply at 2-10.

ERISA provides that "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 502(a)(1)(B) ("§ 502(a)(1)(B)").  "ERISA plans are construed according to federal common law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  "In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable."  *Lionelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) (citing § 1132(d)(2)).

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "If the plan does reserve discretion [to the Plan administrator], the denial is subject to arbitrary and capricious review and will be overturned only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 658 (2d Cir. 2013) (quoting *Kintsler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (additional quotation marks and citation omitted)).

Which standard of review applies is critical because "[u]nder the arbitrary and capricious standard of review, we may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).   An arbitrary and capricious scope of review is "narrow" such that the court may not substitute its own judgment for that of the claims administrator as if the issue of LTD benefits eligibility were being considered anew, *id.* (citing cases), and "[w]here it is necessary for a reviewing court to choose between two competing yet reasonable interpretations of a pension plan, this Court must accept that offered by the administrators."   *Id.* (citing *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1273 (2d Cir. 1995).   A decision is 'arbitrary and capricious [if it] is without reason, unsupported by substantial evidence or erroneous as a matter of law.'"   *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995) (internal quotation marks and citation omitted).   Furthermore, "a district court's review under the arbitrary and capricious standard is limited to the administrative record."   *Miller*, 72 F.3d at 1071.

In contrast, under *de novo* review, the "default standard," the court gives no deference to the administrator's decision, *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 103 (2d Cir. 1991); rather, the district court is authorized to act as the finder of fact.   *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003).   Under *de novo* review, the review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence."   *DeFelice v. American International Life Assurance Company of New York*, 112 F.3d 61,

67 (2d Cir. 1997).  Toward that end, "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause."  *Id.* at 66.  As such, "upon *de novo* review, even purely factual interpretation cases may provide a district court with good cause to exercise its discretion to admit evidence not available at the administrative level if the administrator was not disinterested."  *Id.*  Further, the rule of *contra proferentum*, *i.e.*, "'that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter,'" applies only upon *de novo* review of an ERISA determination.  *Pagan*, 52 F.3d at 443 (quoting *O'Neil v. Retirement Plan For Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir. 1994)).

The insurer or administrator bears the burden of proving it has discretion, and "[a]mbiguities are construed in favor of the plan beneficiary."  *Krauss*, 517 F.3d at 622.  "However, regardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact."  *O'Hara v. National Union Fire Insurance Company of Pittsburgh, PA*, 642 F.3d 110, 117 (2d Cir. 2011).

Defendant maintains the clear and unambiguous language of the Plan documents, consisting of the Plan Contract, LTD Plan and the SPD establishes that all Plan Documents refer to each other thereby demonstrating that it was intended that Plan Documents be read together.  Defendant's Memorandum at 15-21; Defendant's Response at 10-19; Defendant's Reply at 2-10.  Defendant further maintains that the Plan Documents expressly grant Defendant discretionary authority to interpret the terms

of the LTD Plan to determine Plan benefits eligibility.  *Id.*  Defendants particularly relies

on the language of the SPD as granting Defendant sole discretionary authority to

interpret the plan and determine a claimant's eligibility for benefits under the LTD Plan.

Plaintiff, however, maintains that the only document specifically granting Defendant the

requisite discretionary authority for application of arbitrary and capricious review is the

SPD, which technically is not part of the LTD Plan and, as such, is insufficient to avoid

*de novo* review.  Plaintiff's Memorandum at 10-14; Plaintiff's Response at 2-6; Plaintiff's

Reply at 6-13.

The Plan Contract specifically lists as the documents comprising the Plan

Contract "(1) the Group Insurance Certificate(s) listed in the Schedule of Plans, . . .; (2)

all modifications and endorsements to such Group Insurance Certificates . . .; (3) the

forms shown in the Table of Contents as of the Contract Date; (4) the Contract Holder's

application . . . ;(5) any endorsements or amendments to the Group Contract; and (6)

the individual applications, if any, of the persons insured.  LTD Plan Contract at PRU

0062.  In none of the listed documents, however, is the manner in which a claimant's

disability is to be determined stated; the Coverage Certificate merely provides that an

employee will be considered disabled for purposes of receiving LTD benefits when

Prudential determines that "you are unable to perform the *material and substantial*

*duties* of *your regular occupation* due to your *sickness* or *injury*," are under a doctor's

care, and have a greater than 20% loss of monthly earning due to the sickness or injury.

Coverage Certificate at PRU 0014 (italics in original).

Generally, "language that establishes an objective standard does not reserve

discretion, while language that establishes a subjective standard does."  *Krauss*, 517

F.3d at 622.  "Although we do not require the plan to employ any particular language to reserve discretion, the chosen words must clearly convey the administrator's intent." *Thurber*, 712 F.3d at 658 (quoting *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005)).  "A reservation of discretion need not actually use the words 'discretion' or 'deference' to be effective, but it must be clear."  *Nichols*, 406 F.3d at 108.  "Since clear language can be readily drafted and included in policies . . . courts should require clear language and decline to search in semantic swamps for arguable grants of discretion."  *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (internal quotation marks and citation omitted).

That the SPD is not part of the LTD Plan's documents is consistent with the SPD's statement that "The Summary Plan Description is not part of the Group Insurance Certificate."  SPD at PRU 0042.  Although Defendant urges the court to construe this statement as indicating only that the SPD is not part of the Coverage Certificate, Defendant's Memorandum at 19 & n. 9, in none of the other listed documents is there any indication such document incorporates the terms of the SPD, nor does the SPD indicate so.[36]

"Summary documents," such as an SPD, "important as they are, provide communication with beneficiaries about the plan, but [ ] their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."  *CIGNA Corp. v. Amara*, __ U.S. __; 131 S.Ct. 1866, 1878 (2011) (italics in original).  Plan administrators are required under 29 U.S.C. § 1022(a) to furnish ERISA plan participants and beneficiaries with an SPD "written in a manner calculated to be

---

[36] It is possible the statement that the SPD is not part of the Coverage Certificate was included in the SPD only to differentiate the SPD from the immediately preceding Coverage Certificate.

understood by the average plan participant" and "sufficiently accurate and comprehensive to reasonably apprise [them] of their rights and obligations under the plan."

In the instant case, the SPD states, in pertinent part, that

The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.  The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

SPD at PRU 0044.

As such, the SPD's language granting Prudential authority to determine LTD benefits claims would vest Prudential with sufficient discretion to trigger arbitrary and capricious review except for the fact that such language does not appear in the LTD Plan documents, but only in the SPD.  The terms of the SPD are thus inconsistent with the terms of the LTD Plan documents and, as such, "do not themselves constitute *terms* of the plan for purposes of § 501(a)(1)(B)."  *CIGNA Corp.*, 131 S.Ct. at 1878 (italics added).  *See Durham v. Prudential Ins. Co. of America*, 890 F.Supp.2d 390, 395 (S.D.N.Y. 2012) (holding where only SPD contained provision attempting to grant ERISA plan administrator with discretion, yet SPD was not part of the Plan's group insurance certificate, the SPD conflicted with the Plan and did not confer discretionary authority on the administrator) .

Plaintiff's claims are thus subject to *de novo* review.

## 2.    Merits of Claims

Plaintiff maintains *de novo* review requires a bench trial on the merits of Plaintiff's claims.  Plaintiff's Memorandum at 14-15.  Defendant maintains in contrast that even under the *de novo* standard of review, the court's review is limited to the administrative

record that was before the claims administrator, Defendant's Response at 23 (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003), whose determination may not be substituted by the court's own determination. *Id.* 23-24 (citing *Muller*, 341 F.3d at 125; and *McNinch v. Goodyear Tire & Rubber Co., Inc.*, 2005 WL 735963 (W.D.N.Y. Mar. 30, 2005)).

In the instant case, Prudential maintains that Bochniarz's LTD benefits were terminated on September 1, 2009, because Bochniarz had been awarded LTD and Premium Waiver benefits effective August 31, 2007, based on Bochniarz's medical records indicating cervical spine issues supported by diagnostic testing, and "self-reported symptoms of various types of pain and fatigue that were inconsistently and speculatively diagnosed as lupus and or fibromyalgia," but that numerous periodic reviews of Bochniarz's claim and medical records failed support that such symptoms continued to render Bochniarz unable to perform her regular occupation as a computer programmer.  Defendants' Memorandum at 22.  Defendant maintains Bochniarz was initially awarded LTD and Premium Waiver benefits in anticipation that Bochniarz would be undergoing lumbar fusion surgery which would allow her to return to work, and continually extended such benefits to accommodate repeated postponements of such surgery.  *Id.*  A thorough review of Bochniarz's records, including her self-reported symptoms, showed Bochniarz had increased functionability as of September 1, 2009, with the anticipated back surgery no longer deemed necessary by Bochniarz's own physicians, based on objective diagnostic tests and medical evaluations.  *Id.* at 22-23.  Further, by November 2008, Bochniarz's lupus, the secondary basis on which Bochniarz was awarded LTD and Premium Waiver benefits, and the condition for which

Bochniarz's back surgery was repeatedly postponed, was determined to be under control such that Bochniarz saw her treating rheumatologist only once in 2008 and 2009. *Id.* Defendant moreover maintains the activities check and surveillance of Bochniarz revealed that Bochniarz, contrary to her own assertion, was active during the day, driving, walking and socializing outside her home, and operating a dog breeding business. *Id.* Accordingly, Bochniarz's LTD and Premium Waiver benefits respectively were terminated effective August 31 and 28, 2009. *Id.* Defendant further maintains that insofar as Bochniarz's LTD benefits were based on self-reported symptoms, the benefits had a limited pay period of 24 months. *Id.* at 25-27.

In opposition to summary judgment, Plaintiff argues that the Plan's self-reported symptoms limitation does not apply to Plaintiff's case because the limitation applies only when disability is claimed based on a combination of self-reported symptoms and mental illness, Plaintiff's Response at 7, none of the five letters issued by Prudential denying Bochniarz LTD and Premium Waiver benefits mentions the limitation as a basis for such denial as required under ERISA, *id.* at 7-9 (citing 29 U.S.C. § 1133), the limitation does not apply to the facts of this case because Bochniarz's symptoms of pain and fatigue were supported by her treating physician's clinical findings that Bochniarz suffered from SLE, *id.* at 9-11, and that Bochniarz provided sufficient medical evidence supporting her LTD benefits claim beyond August 31, 2009. *Id.* at 12-13.

In further support of summary judgment, Defendant argues that although Plaintiff relies on medical records indicating Bochniarz has been diagnosed with lupus and MRI findings indicating cervical and lumbar spine disk herniations such that Bochniarz's descriptions of her pain should have been sufficient proof of her disability, Plaintiff relies

on the opinion of only one physician, Dr. Grisanti, whose opinion is in conflict with three physicians who examined and treated Bochniarz, including Drs. Kuruvilla, Bansal, and Holmlund, as well as two independent physicians who reviewed Bochniarz's medical records.  Defendant's Reply at 11-12.

It is settled that Plaintiff has the burden of proving she is disabled under the terms of the LTD Plan.  *Paese v. Hartford Life and Accident Insurance Company*, 449 F.3d 435, 441 (2d Cir. 2006) (citing *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).  Because "there is no right to a jury trial in a suit brought to recover ERISA benefits, and thus the district court would have been the factfinder at trial, the district court's task on a summary judgment motion – even in a nonjury case – is to determine whether genuine issues exist for trial, not to make findings of fact."  *O'Hara v. National Union Fire Insurance Company of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011) (citing *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 568 (2d Cir. 1998)).  It is, however, only where the parties consent to a bench trial on the parties' submissions, stipulating to the administrative record and waiving the right to call witnesses, that the district court may "'make explicit findings of fact and conclusions of law' pursuant to Federal Rule of Civil Procedure 52(a)."  *Id.* (quoting *Muller*, 341 F.3d at 124).  Here, because the parties have not stipulated to a "'summary trial' or a "bench trial 'on the papers,' . . . the district court [is] obliged to proceed in traditional summary judgment fashion."  *Id.*  Simply put, the court "must determine whether [Plaintiff] presented evidence from which a reasonable factfinder could conclude that she was disabled within the meaning of the [LTD benefits] plan."  *Id.* at 119 (citing cases).

Further, applying a *de novo* standard of review, the court gives no deference to the administrator's decision.  *O'Hara*, 642 F.3d at 116; *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 103 (2d Cir. 1991).  Under *de novo* review, "[a] district court reviewing a denial of benefits de novo may consider evidence outside the administrative record if it finds 'good cause' to do so."  *Sanford v. TIAA-CREF Individual & Institutional Services, Inc.*, __ Fed.Appx. __; 2015 WL 1881396 at * 1 (2d Cir. Apr. 27, 2015) (citing Muller, 341 F.3d at 125)); *DeFelice v. American International Life Assurance Company of New York*, 112 F.3d 61, 67 (2d Cir. 1997) (the district court's "review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.'").  "The doctrine limiting review of ERISA claims to evidence before the plan administrator was developed to prevent federal courts from becoming 'substitute plan administrators' and thus to serve ERISA's purpose of providing a method for workers and beneficiaries to resolve their disputes over benefits inexpensively and expeditiously."  *Daniel v. UnumProvident Corp.*, 261 Fed.Appx.316, 318 (2d Cir. Jan. 4, 2008) (internal quotation marks and citations omitted).  Relevantly, "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause."  *DeFelice*, 112 F.3d at 66.  "Good cause" exists where, as here, Defendant, as both the Plan's claims administrator and insurer, is not disinterested.  *Paese*, 449 F.3d at 441.  As such, "upon *de novo* review, even purely factual interpretation cases may provide a district court with good cause to exercise its discretion to admit evidence not available at the administrative level if the administrator was not disinterested."  *DeFelice*, 112 F.3d at 66.

Preliminarily, the court addresses Plaintiff's assertion that the SSA's determination that Bochniarz was disabled also establishes Defendant recognized the severity of Bochniarz's disability especially given that Prudential hired Allsup to represent Bochniarz and obtain SSD benefits for her.  Plaintiff's Response at 13.  "While SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound by the award and is not required to accord that determination any 'special deference.'"  *Testa v. Hartford Life Ins. Co.*, 483 Fed.Appx. 595, 598 (2d Cir. 2012) (quoting *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010)).  Accordingly, the SSA's determination, upon Bochniarz's application at Defendant's behest, that Bochniarz's medical condition renders her eligible for SSD benefits in not entitled to any special deference on summary judgment. Nevertheless, "[t]he Second Circuit 'encourages plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion,' but it does not require that an administrator do so."  *Wedge v. Shawmut Design and Const. Group Long Term Disability Insurance Plan*, 23 F.Supp.3d 320, 344 (S.D.N.Y. 2014) (quoting *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 92 (2d Cir. 2009) (ERISA plan administrator's explanation for reason claimant was determined not disabled for purposes of long-term disability benefits under ERISA "furthers ERISA's goal of provided claimants with additional information to help them protected their claims for subsequent appeals.").

With regard to the opinions of Bochniarz's treating physicians, "the Supreme Court has explicitly stated that, unlike SSA, ERISA Plan administrators need not give special deference to a claimant's treating physician."  *Paese*, 449 F.3d at 442 (quoting

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").  Nevertheless, an ERISA plan administrator "'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'"  *Id.*  As such, although no special deference to a treating physician's opinion is required, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."  *Paese*, 449 F.3d at 442. Thus, the evaluations of Bochniarz's treating physicians may be considered on Defendant's motion.

Defendant argues that Bochniarz's receipt of LTD Benefits was based on self-reported symptoms which were subjected to a limited pay period of 24 months. Defendant's Memorandum at 25-26.  According to Defendant, once Bochniarz's doctors determined Bochniarz's back problems "were no longer an issue, all of Bochniarz's complaints were self-reported symptoms of pain, fatigue, weakness and cognitive issues," all subjective complaints subject to the Plan's self-reported symptoms limitation of 24 months which expired on September 24, 2009.  *Id.* at 26-27.  In opposition to summary judgment, Plaintiff argues that the plain language of the self-reported symptom limitation establishes it "applies only when 'self-reported symptoms' and mental illness combine."  Plaintiff's Response at 7.  Plaintiff also asserts that Defendant did not assert the self-reported symptoms limitation as a reason for terminating benefits

43

despite issuing five letters denying Bochniarz benefits under the Plan, including the
September 10, 2009 Termination Letter, the September 14, 2009 Premium Waiver
Termination Letter, the May 7, 2010 First Appeal Determination, the May 21, 2010
Premium Waiver Appeal Decision, and the March 15, 2011 Second Appeal
Determination, and, as such, each of the letters fails to set forth the specific reason for
terminating Bochniarz's benefits under the Plan, in violation of ERISA's requirement that
the specific reasons for denying benefits must be set forth in writing "in a manner
calculated to be understood by the participant." *Id.* at 7-8 (quoting 29 U.S.C. § 1133).
According to Plaintiff, principles of waiver and estoppel should prevent Defendant from
now asserting the self-reported symptoms limitation as a ground for terminating
Bochniarz's benefits. *Id.* at 8-9.  Plaintiff further maintains that the limitation applies only
where self-reported symptoms are the only method by which a claimed disability is
diagnosed, a factual distinction from the instant case where Bochniarz's lupus and
significant orthopedic problems were diagnosed based on her physicians' clinical
findings. *Id.* at 9-11.  In further support of summary judgment, Defendant argues a plain
reading of the limitation's language fails to establish its applicability only when a
claimant has both self-reported symptoms and mental illness for a total of 24 months,
Defendant's Reply at 14-15, that the Termination Letter, the First Appeal Determination
and the Second Appeal Determination all set forth the entire self-reported symptom
limitation provision, *id.* at 15, and there is insufficient evidence in the record establishing
Bochniarz's lupus and pain were attributed to anything other than self-reported
symptoms. *Id.* at 15-16.

The Plan's self-reported symptoms limitation provides that

Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on *self-reported symptoms* have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to *mental illness* also have a limited pay period during your lifetime.

The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

Administrative Record at PRU 0023.

A plain reading of this provision establishes that, contrary to Plaintiff's assertion, the self-reported symptoms limitation does not only apply where a claimant asserts disability based on both self-reported symptoms and mental illness occurring for the same 24-month period but, rather, establishes that throughout a claimant's lifetime, 24 is the maximum number of months for which a claimant can receive benefits where the disabling condition is either based on self-reported symptoms or mental illness.

Further, as Defendant points out, the self-reported symptoms limitation is referenced in the Termination Letter, Administrative Record at PRU 0733, the First Appeal Determination, *id.* at PRU 0714, and the Second Appeal Determination, *id.* at PRU 0686, such that Plaintiff's assertion that Defendant failed to comply with 29 U.S.C. § 1133 (requiring "every employee benefit plan shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant . . ."), is without merit.  Nevertheless, as discussed below, Discussion, *infra*, at 46-51, there are fact issues as to whether the self-reported symptom limitation applies to the facts of the instant case.

In particular, a thorough review of the record establishes genuine questions of material fact exist as to whether Defendant's termination of Bochniarz's LTD and Premium Waiver benefits is supported by the Administrative Record.  First, Defendants' assertion that the only documented evidence of Bochniarz's lupus is a single blood test performed on July 13, 2009, the result of which indicated Bochniarz had an abnormal anti-body level, Defendant's Reply at 15 (citing Administrative Record at PRU 0172, 0177), is incorrect.  Upon examining Bochniarz on July 6, 2007, Bochniarz's treating rheumatologist, Dr. Grisanti reported Bochniarz had a lupus flare with CPK level elevated at 275 compared to the normal level of less than 165.  Administrative Record at PRU 0816.  On August 29, 2007, Dr. Grisanti reported that a "high dose of Prednisone" decreased Bochniarz's swelling, muscle problems and vertigo, which Dr. Grisanti attributed to SLE.  *Id.*   Plaintiff was also prescribed Plaquenil for Lupus.  *Id.* at 541.  Upon examining Bochniarz on December 11, 2007, Dr. Thomas reported Dr. Grisanti was "following some abnormalities" detected in Bochniarz's blood including "persistently elevated CPK," which were postponing Bochniarz's back surgery.  *Id.* at PRU 621.  On May 22, 2008, blood tests ordered by Dr. Grisanti showed Bochniarz's ANA elevated at 1:160, speckled pattern and a positive Sjögren's AB, *id.* at PRU 0800, and on August 13, 2009, Bochniarz's serum complement test was low, *id.* at PRU 0169, signaling inflammation.  Elevated CPK,[37] elevated ANA and low serum complement[38]

---

[37] *See* Creatine Phosphokinase (CPK), available at http://www.hopkinslupus.org/lupus-tests/creatine-phosphokinase-cpk/ (last visited June 23, 2015).
[38] *See* Lupus Blood Tests, available at http://www.hopkinslupus.org/?s=ANA (last visited June 23, 2015).

are accepted indicia of SLE, and a diagnosis of Sjögren's Syndrome often overlaps a Lupus diagnosis.[39]

Dr. Kuruvilla, a rehabilitation medicine specialist, examined Bochniarz three times between March and May 2009, assessing Bochniarz on March 11, 2009, with "[g]eneralized musculoskeletal and joint pain which is multifactorial and could be caused by lupus erythematosus and the associated anthralgias and arthritis . . . ." Administrative Record at PRU 0398.  Dr. Kuruvilla confirmed previous findings of degenerative disk disease and disk hernation, as well as myofascial pain and myositis "again from lupus." *Id* (underlining added).  Significantly, Dr. Kuruvilla opined that Bochniarz was not "a surgical candidate" because he "doubt[ed] it will take away all her pain." *Id*.  Dr. Kuruvilla's opinion remained the same upon examining Bochniarz on March 26, 2009, again finding Bochniarz had lupus erythematosus and generalized musculoskeletal and joint pain. *Id*. at PRU 0391.  Dr. Kuruvilla attributed Bochniarz's abnormal EMG study results to "chronic lupus erythematosus which may be the cause of vasculitis and directly causing the generalized neuropathy." *Id*. at PRU 0392 (underlining added).  Dr. Kuruvilla further assessed that Bochniarz would not "benefit from any lumbar epidural steroid injections" because Bochniarz needed "control of her lupus and focus more on home exercise program." *Id* (underlining added).  After examining Bochniarz on May 12, 2009, Dr. Kuruvilla's impression was "[c]hronic pain syndrome with system lupus erythematosus" for which Bochniarz has "undergone and tried multiple conservative and rehab treatment modalities, but without any help," such that Dr. Kuruvilla was without "any other options." *Id*. at PRU 0390 (underlining added).

---

[39] *See* Overlap of Sjögren-lupus erythematosus syndrome, available at http://www.ncbi.nlm.nih.gov/pubmed/7672985 (last visited June 23, 2015).

At a July 9, 2009 examination, pain management specialist Dr. Bansal's impression was "[e]xtensive amount of myofascial pain in the lumbar paravertebral, gluteal, pyriformis, iliotiblia fascia," with tenderness over the L5-S1 facets joints, both right and left, and "[e]xtensive amount of myofascial pain in the neck shoulder upper back." *Id.* at PRU 0383, 0502.

Upon neuromuscular consultation performed on August 13, 2009, by Dr. Holmlund, Bochniarz's CPK was elevated at 244, ANA was positive at 1:640, complements were low, and rheumatoid factor was negative. *Id.* at PRU 0169. Dr. Holmlund commented that Bochniarz appeared "chronically ill and ash color." *Id.* at PRU 0170. Accordingly, there is objective medical evidence in the record supporting Bochniarz's diagnosis of SLE beyond Bochniarz's self-reported symptoms of pain.[40]

Genuine issues of material fact also exist regarding the basis for Defendant's decision to terminate Bochniarz's LTD and Premium Waiver benefits. Defendant's initial decision terminating Bochniarz's benefits was based on its determination that Bochniarz's lumbar degenerative disc disease and cervical herniated nuclear pulposis did not render Bochniarz incapable of performing her regular occupation as a computer programmer, which was considered sedentary work, and there were no restrictions to Bochniarz's work capacity based on lupus, myofascial pain or anxiety/depression. Administrative Record at PRU 0734. Defendant further stated Bochniarz was "able to socialize regularly, perform daily activities, and maintain energy throughout the day." *Id.* In its First Appeal Determination upholding the termination of Bochniarz's benefits,

---

[40] Even under an arbitrary and capricious standard of review, Dr. Thomas's comment, peremptorily dismissing the findings of Bochniarz's treating physicians, none of whom questioned the sincerity of Bochniarz's complaints of pain, is not supported given the plethora of objective medical evidence of Bochniarz's SLE.

Defendant stated that its earlier decision was based on the medical evidence submitted by Bochniarz which showed Bochniarz's self-reported symptoms of pain were not supported by, consistent with, or proportionate to the diagnostic testing and physical examinations. *Id.* at PRU 0713-18. In the Second Appeal Determination, Defendant again found Bochniarz's self-reported symptoms were not supported by objective medical testing, and also stated that Bochniarz's cervical spine surgery in December 2010 was irrelevant to its decision because it occurred more than 14 months after Bochniarz's benefits were terminated. *Id.* at PRU 0685-93. There are, however, issues of fact as to whether the evidence in the record supports Defendant's reasons for terminating Bochniarz's benefits.

The final external review of the record by occupational medicine specialist Dr. Taylor, on which Defendant relies, Defendant's Memorandum at 25, shows that Dr. Taylor misinterpreted several key pieces of evidence. In particular, Dr. Taylor stated that restrictions and limitations imposed on Bochniarz by Dr. Grisanti were "not medically necessary" because the records, "especially the surveillance documentation, indicate that the claimant is capable of more." Administrative Record at PRU 0137. Dr. Taylor then pointed to the August 10, 2009 surveillance of Bochniarz's home by the RCGI surveillance team, stating the investigation

> confirmed that [Bochniarz] was actively involved in a dog-breeding business being operated out of the house with her daughter, that it was confirmed that she was not presently working, but that she did keep a very busy lifestyle, often coming and going from her house several times a day, and remaining away from her home for several hours at a time.

*Id.* at PRU 0137.

A plain reading of the RCGI surveillance team reports, however, only raises genuine issues of material fact, ignored by Dr. Taylor in rendering her opinion, and which Plaintiff can pursue at trial.

First, although the surveillance established that Bochniarz's home was located on a large lot on a rural road, Administrative Record at PRU 0463, 0466, there is no indication as to how far away the unidentified neighbors with whom the surveillance team spoke lived, nor is there any indication that such neighbors were able to clearly observe activity at Bochniarz's home from their own residences.  The unidentified neighbor who described Bochniarz as "being fairly active" and coming and going from her home several times a day was described as living "further down the street."  *Id.* at PRU 0466.  Another unidentified neighbor estimated the time Bochniarz had lived at her residence as "five to ten years," and Bochniarz's daughter's age as "between twenty and twenty five years."  *Id.*  These five year ranges call into question how well this neighbor knew Bochniarz.  Despite repeated references to Bochniarz being actively involved in breeding dogs, it took the surveillance team several attempts before contacting the dog breeding business, which was named "Mandy's Puppy Patch," indicating the business may have belonged to Bochniarz's daughter's Amanda. Significantly, the surveillance team, even after contacting Amanda and speaking with her about the dog breeding business, did not report observing any actual dog breeding activity such as people arriving at the home and leaving with a puppy, nor did they report seeing Bochniarz or anyone else outside tending to any dogs; rather, the surveillance team commented that it was difficult to reach the dog breeding business and did not assert that either Amanda or the male observed leaving Bochniarz's

residence on January 10, 2010, mentioned there were any puppies then available for adoption.  Moreover, the surveillance team's own observation, in which Bochniarz was definitely observed on only one occasion driving her vehicle, is inconsistent with the unidentified neighbors' descriptions of Bochniarz as leading an active life and running a dog-breeding business.

Accordingly, reliance on this aspect provides insufficient support for Defendant's motion for summary judgment.

### 3.    LTD Benefits Offset

Plaintiff claims Defendant improperly offset Bochniarz's SSD benefits, thereby reducing the amount of monthly LTD benefits Bochniarz received.  Second Amended Complaint ¶ 8.  Defendant maintains that it acted within the scope of applicable law as well as the plain language of the LTD Plan in recouping as an overpayment of LTD benefits those amounts Bochniarz received as SSD benefits.  Defendant's Memorandum at 29-30 & n. 11.  Plaintiff does not argue in opposition to Defendant on this point and Defendant, in replying in further support of summary judgment, does not again address it.  As such, Plaintiff, by failing to rebut Defendant's assertion on this point, has effectively conceded it.  *See Ceglia v. Zuckerberg*, 2013 WL 1208558, at * 20 (W.D.N.Y. Mar. 26, 2013) (citing cases), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 Fed Appx. 34 (2d Cir. Apr. 20, 2015).

Alternatively, should the District Judge disagree with the undersigned's recommendation that Plaintiff, by failing to argue in opposition to Defendant regarding the legality of the offset, has effectively conceded to Defendant on the claim, the Second Circuit Court of Appeals recognizes that LTD benefits available under an ERISA

plan may be offset by SSD benefits.  *See Leonelli*, 887 F.2d at 1198-99 (denying as futile ERISA plaintiff's motion to amend complaint to assert claim for LTD benefits where any such benefits the plaintiff could receive under his employer's long-term disability plan would be completely offset by worker's compensation and SSD benefits the plaintiff was already receiving as authorized by the plan).  Accordingly, insofar as Plaintiff challenges the legality of Defendant's reduction of his LTD benefits by the amount Bochniarz received as SSD benefits, summary judgment should be GRANTED as to Defendant and DENIED as to Plaintiff.

## CONCLUSION

Based on the foregoing, Plaintiff's motion (Doc. No. 49), should be GRANTED; Defendant's motion (Doc. No. 51), should be DENIED in part, and GRANTED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 22, 2015
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*,  474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 22, 2015
            Buffalo, New York